**Morton LEVINE, suing individually and on behalf of all other shareholders of NL Industries, Inc. similarly situated, Plaintiff,**

v.

**NL INDUSTRIES, INC., Defendant.**

**No. 86 Civ. 7453 (MGC).**

United States District Court, S.D. New York.

July 31, 1989.

Rabin & Sirota, New York City by Howard B. Sirota, Rachell Sirota, and Gene Mesh & Associates, Cincinnati, Ohio by Gene Mesh, for plaintiff.

Dorsey & Whitney, New York City by Richard L. Bond, Stephen B. Camhi, Stewart D. Aaron, Robert G. Manson, for defendant.

## OPINION AND ORDER

CEDARBAUM, Judge.

This is a class action brought by plaintiff Morton Levine on behalf of all persons who purchased the common stock of NL Industries, Inc. ("NL") between January 27, 1982 and December 10, 1984 (the "class period"). The complaint alleges that NL violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, with respect to two entirely separate operations.[1] All pre-trial discovery has been completed in this case. NL has moved for summary judgment dismissing the complaint. In addition, NL has moved to amend its answer to assert a statute of limitations defense.

---

1. In the Joint Pre–Trial Order, plaintiff also makes a claim for common law fraud. This claim is not in the complaint, and is therefore not properly before the court.

This opinion is limited to NL's motion for summary judgment dismissing Levine's claim of fraudulent omission with respect to NLO, Inc. ("NLO"). Levine's claim with respect to NL's petroleum services business and NL's statute of limitations defense will be addressed separately. Levine claims that NL should have disclosed that NLO, a wholly-owned subsidiary of NL, was operating the Feed Materials Production Center at Fernald, Ohio (the "Fernald Facility") in violation of state and federal environmental laws, and that as a result NL was subjecting itself to significant liability. According to plaintiff, all the purchasers of common stock of NL during the class period paid an inflated price for the stock because this information was not disclosed. For the reasons discussed below, partial summary judgment dismissing this claim is granted.

## BACKGROUND

Defendant NL is a New Jersey corporation with its principal place of business in Houston, Texas. It is a publicly-held corporation whose stock was listed and traded on the New York Stock Exchange throughout the class period. NL's principal lines of business are petroleum services and chemicals. In 1982, NL's petroleum services group accounted for 78.5% of NL's total sales; in 1983, 66%; in 1984, 65.3%.

In March of 1982, plaintiff Levine purchased 100 shares of NL common stock at a price of $22 per share. In April of 1982, Levine sold these shares at a price per share of $26⅞. In June of 1982, Levine purchased 100 shares of NL common stock at $22⅛ per share.

The claim at issue is based on the activities of NL's subsidiary, NLO. From the early 1950's until December 31, 1985, NLO operated the Fernald Facility for the United States Department of Energy ("DOE"), which owns the facility. NL never operated the Fernald Facility, but it guaranteed NLO's performance of the contract that NLO had entered into with DOE. Fernald Facility is a uranium processing center. During the class period, the annual revenue derived by NL from NLO's operation of the Fernald Facility was never more than 0.2% of NL's annual gross revenue.

On December 10, 1984, it was publicly disclosed that uranium dust had been emitted accidentally at the Fernald Facility. The closing price per share of NL common stock on December 7, 1984, three days before the public announcement of the uranium emissions, was $10⅞. The closing price on December 10 was $11⅛, and the closing price on December 14 was $11⅛. After the end of the class period, on January 23, 1985, a class action was brought against NL and NLO by landowners and residents within a five-mile radius of the Fernald Facility. *In re Fernald Litigation,* C-1-85-0149 (S.D.Ohio). In that action, the plaintiffs seek $100 million in compensatory damages and $200 million in punitive damages for alleged diminution of property value and emotional distress which allegedly resulted from emissions of uranium from the facility. On January 18, 1985, five days before the filing of *In re Fernald Litigation,* the closing price per share of NL common stock was $11. The closing price on January 23 was $11¼, and the closing price on January 29 was $11⅝. On March 11, 1986, the State of Ohio brought a separate action against DOE, NLO and NL seeking clean-up and response costs, residual damages and civil penalties for alleged violations of various environmental statutes and regulations. *State of Ohio v. United States Department of Energy,* 689 F.Supp. 760 (S.D.Ohio 1988). On March 6, 1986, five days before the filing of *State of Ohio,* the closing price per share of NL common stock was $13½. The closing price on March 11 was $14⅜, and the closing price on March 18 was $14⅛.

## DISCUSSION

Fed.R.Civ.P. 56 provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). In assessing the record, "all

ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady*, 863 F.2d at 210; *see also Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). However, if after discovery a nonmoving party fails to make a showing sufficient to establish the existence of an element essential to one of the claims, and on which that party will bear the burden of proof at trial, summary judgment may be granted on that claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no "genuine issue as to any material fact" because a failure of proof on an essential element of a claim of a non-moving party "necessarily renders all other facts immaterial" as to that claim. *Id.* at 323, 106 S.Ct. at 2552. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Here, plaintiff has failed to make a showing sufficient to establish the existence of all the elements essential to his claim under section 10(b) and Rule 10b–5. Rule 10b–5 provides in pertinent part that it "shall be unlawful ... to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." In order for an omission to be actionable, the omitted information must have been material, and there must have been a duty to disclose it. *See Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26 (1st Cir.1987) ("Even if information is material, there is no liability under Rule 10b–5 unless there was a duty to disclose it."). *See also In re Union Carbide Class Action Securities Litigation*, 648 F.Supp. 1322, 1326 (S.D.N.Y.1986); *Whitbread (US) Holdings, Inc. v. Baron Philippe De Rothschild*, 630 F.Supp. 972, 977–78 (S.D.N.Y.1986). A duty to disclose arises when the undisclosed fact is necessary to make a statement made not misleading, or when a statute or regulation requires disclosure of the fact. A "misleading" statement is one which conveys a false impression. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

■ Plaintiff argues that NL should have disclosed that NLO was operating the Fernald Facility in violation of state and federal law, and that as a result NL was subjecting itself to significant liability. Plaintiff contends that NL had a duty to disclose that NLO was operating the Fernald Facility in violation of the law because statement of that fact was necessary in order to make several statements made in NL's Annual Reports for 1981–83 and in the Annual Form 10-Ks which NL filed with the Securities and Exchange Commission in 1981–84 not misleading. In addition, plaintiff argues that 17 C.F.R. §§ 229.101(c)(1)(xii) and 229.103 imposed a duty on NL to disclose this information.

In response, defendant argues that even if NLO operated the Fernald Facility in violation of the law, NL did not have a duty to disclose that fact. Defendant contends that its disclosure on the Form 10-K that its "wholly-owned subsidiary, NLO, Inc., is the contract operator for the U.S. Department of Energy of the uranium ore concentration plant at Fernald, Ohio" was sufficient, and that the statements that plaintiff points to were not misleading because they pertained only to facilities owned by NL. In addition, defendant argues that it has disclosed all the information that it was required to reveal under 17 C.F.R. §§ 229.101(c)(1)(xii) and 229.103. Defendant also takes the position that in any event the alleged omissions were not material because (1) NLO and NL were protected from liability by the government contractor's defense; and (2) NLO and NL were to be contractually indemnified by DOE in the event of liability or loss.

Section 229.101(c)(1)(xii) did not require NL to disclose that NLO was operating the Fernald Facility in violation of the law.

This section requires disclosure "as to the material effects that compliance with Federal, State and local provisions ... relating to the protection of the environment, may have upon the capital expenditures, earnings and competitive position of the registrant and its subsidiaries." Thus, this section does not mandate the disclosure of the information which plaintiff argues should have been revealed.

In any event, NL did not have to disclose any information pursuant to this section. Under the contract between DOE and NLO, DOE, which owned the facility, was obligated to pay for all expenses which NLO incurred in complying with environmental laws. *See* Plaintiff's Exhibit P. Thus, compliance with the law could not have had a material effect on NL's capital expenditures or earnings. Plaintiff argues that compliance with the law could have had a material effect on NL's competitive position. However, while plaintiff's allegation that NLO operated the Fernald Facility in violation of the law, if true, might have affected NL's competitive position, compliance with the law could not have had this effect. Therefore, this regulation did not impose a duty on NL to disclose any information regarding the Fernald Facility that it had not disclosed.

Plaintiff also argues that § 229.103 required NL to disclose that NLO was operating the Fernald Facility in violation of the law. This section required NL to:

> [d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject.... Include similar information as to any such proceedings known to be contemplated by governmental authorities.

Plaintiff's claim under this section suffers from the same deficiencies as does his claim under § 229.101(c)(1)(xii). This section does not mandate disclosure of the information which plaintiff argues should have been revealed. In addition, NL has complied with this section.

In its 1984 Form 10–K, NL disclosed that in early 1985, a class action had been brought against it and NLO by "residents of the area surrounding the [Fernald Facility] seeking damages and an injunction because of alleged excessive air emissions." NL also disclosed that in late December of 1984 and early January of 1985, Ohio had given notice "of an intention to file an action for various alleged violations of federal or state water discharge and hazardous waste laws and regulations" at the Fernald Facility. Plaintiff argues that this information should have been disclosed earlier because "internal NL documents establish[ed] that, no later than September 26, 1983, NL knew that, effective July 1, 1984, Fernald would be in violation of the required NPDES permit and that an NL memo stated '... the action [by the Ohio EPA] could range from granting the new compliance schedule *to a suit for noncompliance and assessment of fines.*' (emphasis supplied)." *See* Letter from Howard B. Sirota to the Court (July 18, 1989). However, this NLO memorandum and NLO's other internal documents reveal only that NL knew that it was possible for Ohio to bring a legal proceeding against it if it was in violation of the required NPDES permit on July 1, 1984. NL had no information that Ohio was contemplating a legal proceeding against it before late December of 1984. In fact, NLO documents show that based on conversations which NLO had with the Ohio EPA on this subject, NLO believed until August 7, 1984 that the "[s]tate people [were] unconcerned and [that] they would ignore any violations...." *See* Plaintiff's Exhibits L and M. Thus, NL did not have a duty to disclose any information under this section until it did so in its 1984 Form 10–K.

Plaintiff also argues that NL had to disclose that NLO was operating the Fernald Facility in violation of the law because without this disclosure, several statements in NL's Form 10–K and its Annual Report were made misleading. In particular, plaintiff points to the following five statements which appeared in NL's 1981–84

Form 10-K.[2]

1. The Company believes its plants are all in good operating condition. . . .

2. NL has continued to implement an environmental control program designed to ensure compliance with governmental requirements with respect to workplace environment, atmospheric emissions, effluent discharge and waste disposal.

3. The major environmental issues presently facing the Company are discussed below.

4. From time to time, one or more of NL's plants is subject to local or state environmental regulatory enforcement. The issues raised in such matters are generally resolved in discussions with the appropriate authorities, and occasionally involve the establishment of compliance programs proposed by NL and/or the payment of penalties which do not have a material effect on NL's sales and profits.

5. The precise nature of future regulations, or the costs that may be required in meeting them, and the environmental problems which may arise in the future cannot be predicted at this time. However, NL does not believe that there will be significant curtailment or interruption of any of its important operations as a result of any failure to comply with present or future environmental laws and regulations.

In addition, plaintiff points to the following statement which appeared in more or less the same form in NL's Annual Reports of 1981–83:

NL's commitment to safe working conditions and a healthy environment is supported by active involvement at all levels of the company to bring about accident reduction, ongoing plant and vehicular safety training and appropriate recognition to plants and divisions which achieve or exceed predetermined goals. 1981 results clearly justified the company's safety programs with plant lost-time accident frequency 29% lower than in 1980 and preventable vehicular accidents 23% under the prior year.

None of these statements were made misleading by NL's failure to disclose that NLO was operating the Fernald Facility in violation of the law. The first statement in the Form 10-K appeared under the heading "Properties." It is clear that the discussion which followed concerned only those properties owned by NL. Thus, a reasonable investor could not have been misled into believing that this statement meant that the Fernald Facility, which NL had disclosed elsewhere in its Form 10-K was owned by DOE, was in good operating condition.

The remaining four statements in the Form 10-K which plaintiff challenges are all under the heading "Legal Proceedings." While the majority of the discussion under this topic was devoted to describing specific legal proceedings which had been instituted against NL, there were several statements regarding environmental regulatory enforcement in general. Plaintiff seizes on these generalized statements and argues that since NLO was operating the Fernald Facility in violation of the law, these statements were misleading.

Since a misleading statement is one which conveys a false impression, *see Texas Gulf Sulphur Co.*, 401 F.2d at 862, the issue here is whether reasonable minds can differ as to whether a reasonable investor would get the impression based on these statements that NLO was operating the Fernald Facility in compliance with the law. None of these statements gives that impression. The only somewhat troublesome statement is the one that "[t]he major environmental issues presently facing the company are discussed below." But Rule 10b-5 requires that the omitted fact make the statements made misleading "in light of the circumstances under which they were made." In light of the circumstances under which this statement was made, a reasonable investor could not have interpreted this statement to mean that NLO was operating the Fernald Facility in compliance with the law. The statement was made at the end of the introductory para-

---

**2.** Some of the statements vary slightly from year to year, but the differences are immaterial.

graph of the "Legal Proceedings" section. It is clear from the title of the section and from the discussion that followed that the phrase "major environmental issues" was defined in terms of environmental issues that were the subject of litigation. Since there were no legal proceedings pending or contemplated involving the Fernald Facility, the fact that NLO was allegedly operating the facility in violation of the law did not make it a "major environmental issue."

Finally, the statement in NL's Annual Report was not made misleading by the failure to disclose that NLO was operating the Fernald Facility in violation of the law. The statement appeared in the Employee Relations section of the Report, and focused on NL's efforts to improve the condition of the workplace for its employees. A reasonable investor could not have gotten the impression based on this statement that NLO was operating the Fernald facility in compliance with the law.

Plaintiff has failed to make a showing sufficient to establish that NL had a duty to disclose that NLO was operating the Fernald Facility in violation of the law. Since the existence of a duty to disclose omitted information is an element essential to plaintiff's claim under section 10(b) and Rule 10b–5, summary judgment in favor of defendant on this claim is appropriate.

## CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment on plaintiff's claim of fraudulent omission with respect to NLO is granted, and that claim is dismissed.

SO ORDERED.