**Morton LEVINE, suing individually and on behalf of all other shareholders of NL Industries, Inc. similarly situated, Plaintiff,**

v.

**NL INDUSTRIES, INC., Defendant.**

**No. 86 Civ. 7453 (MGC).**

United States District Court,
S.D. New York.

Aug. 28, 1989.

Rabin & Sirota by Howard B. Sirota, Rachell Sirota, New York City, and Gene Mesh & Associates by Gene Mesh, Cincinnati, Ohio, for plaintiff.

Dorsey & Whitney by Richard L. Bond, Stephen B. Camhi, Stewart D. Aaron, Robert G. Manson, New York City, for defendant.

## OPINION AND ORDER

CEDARBAUM, District Judge.

This is a class action brought by plaintiff Morton Levine on behalf of all persons who purchased the common stock of NL Industries, Inc. ("NL") between January 27, 1982 and December 10, 1984 (the "class period"). The complaint alleges that NL violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, with respect to two entirely separate operations. All pre-trial discovery has been completed in this case. NL has moved for summary judgment dismissing the complaint. In addition, NL has moved to amend its answer to assert a statute of limitations defense.

In an earlier opinion, I granted defendant's motion for summary judgment on

plaintiff's claim of fraudulent omission with respect to NLO, Inc. ("NLO"). 717 F.Supp. 252. In this opinion, I address plaintiff's remaining claim which focuses on NL's petroleum services business. Plaintiff claims that NL issued nine material misrepresentations concerning the performance of its petroleum services business. According to plaintiff, all the purchasers of common stock of NL during the class period paid an inflated price for the stock because in the public pronouncements concerning its petroleum services business, NL painted a brighter picture of the business' financial picture than was in fact the case. For the reasons discussed below, partial summary judgment dismissing this claim is granted.

## BACKGROUND

Familiarity with the Court's earlier opinion in this case is assumed, and only those facts necessary to the determination of this motion will be set forth here.

Defendant NL is a New Jersey corporation with its principal place of business in Houston, Texas. It is a publicly-held corporation whose stock was listed and traded on the New York Stock Exchange throughout the class period. In March of 1982, plaintiff Levine purchased 100 shares of NL common stock at a price of $22 per share. In April of 1982, Levine sold these shares at a price per share of $26⅞. In June of 1982, Levine purchased 100 shares of NL common stock at $22⅛ per share.

Petroleum services is one of NL's principal lines of business. In 1982, NL's petroleum services business accounted for 78.5% of NL's total sales; in 1983, 66%; in 1984, 65.3%. During the class period, the petroleum services group consisted of a variety of divisions, the largest of which was NL Baroid. NL Baroid mined and delivered to well-sites drilling fluids sometimes referred to as "muds."

NL's petroleum services business focused on the deeper drilling segment of the market. According to NL, it usually takes a number of years to drill a deep oil or gas well, so deep drilling generally is not affected by short-term market factors. During approximately the first four months of any year, petroleum services companies typically experience a decline in revenues because of a cyclical decline in drilling activity caused by seasonal weather-related factors. According to NL, it cannot be determined until May or June of any year—when weather-related impediments to drilling activity have abated—whether winter revenues declined for reasons other than the weather.

During the energy crisis of the 1970's, oil and gas drilling activity increased. As a result, petroleum services companies were highly profitable through 1981. NL had its most successful year in 1981, and that year marked NL's fourth consecutive year of record earnings performance. NL continued to report record results during the first quarter of 1982. However, during portions of the class period, NL, along with virtually all other petroleum services companies, experienced a decline in revenue and income. This decline was the result of a variety of factors which had an adverse impact upon the oil and oil field services industries, including the uncertainty which surrounded the production and pricing policies of OPEC, diminished demand for petroleum products in the United States and abroad, conservation efforts by consumers and severe weather in certain areas.

Plaintiff alleges that "NL made public statements minimizing [these] problems and predicting future favorable results when it internally knew that NL was experiencing deterioration in its business which it internally projected would continue in the future." Plaintiff's 3(g) Statement at 6. Plaintiff asserts that NL's internal documents reveal that NL knew that "its petroleum service operations were experiencing a downward trend far in excess of any seasonal pattern," and that it knew that "deep drilling was being adversely impacted and would experience a continuing difficulty." Plaintiff's 3(g) Statement at 5. Nevertheless, according to plaintiff, NL publicly predicted record results.

As part of its normal business operations, NL compiled several types of internal documents. NL prepared an operating

plan for each fiscal year, which was based upon estimates of future business activity, income and expenses. In addition, each division of the petroleum services group prepared an annual business plan which established budgetary guidelines for the division for the fiscal year. The annual business plans prepared by each division generally were created in the fall of the preceding year for use in each fiscal year. Furthermore, NL's corporate planning department ("the Department") produced projections of future business activity which were used in NL's financial and business planning. The Department's projections were based upon a variety of information, including economic data relating to the incentive to drill, projections by NL's customers, projections by NL's competitors in the petroleum services industry, industry analysts' reports and market information. Finally, as part of the business planning process, each division of NL prepared contingency plans. Contingency plans were prepared every year, including the record earnings years of 1980 and 1981. The contingency plans were based upon potential changes in conditions which could increase or decrease the division's earnings.

## DISCUSSION

■ Fed.R.Civ.P. 56 provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988). In assessing the record, "all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady*, 863 F.2d at 210; *see also Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). However, if after discovery a nonmoving party fails to make a showing sufficient to establish the existence of an element essential to one of the claims, and on which that party will bear the burden of proof at trial, summary judgment may be granted on that claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no "genuine issue as to any material fact" because a failure of proof on an essential element of a claim of a nonmoving party "necessarily renders all other facts immaterial" as to that claim. *Id.* at 323, 106 S.Ct. at 2552. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Here, plaintiff has failed to make a showing sufficient to establish the existence of all the elements essential to his claim under section 10(b) and Rule 10b–5. Rule 10b–5 provides in pertinent part that it "shall be unlawful ... [t]o make any untrue statement of a material fact." Plaintiff alleges that NL made the following nine material misrepresentations:

1. On January 27, 1982 the Wall Street Journal and Dow Jones News Wire ("DJ") reported that Ray C. Adam, Chairman of NL said that each quarter of 1982 will show improvement in its financial position of 1982. Adam stated that NL expected further improvement in its financial position in 1982.

2. As reported by DJ on March 24, 1982, Ray C. Adam said NL expects to report record earnings for the first quarter of 1982 and that the second quarter of 1982 would show significant improvement over 1981. With reference to NL Petroleum Services Operations, Adam said NL was not heavily involved in the more oversupplied categories such as drill rigs or standard tubular goods. He said NL's products and services were used primarily in deeper, more complex wells where demand continues to be relatively strong. Adam stated that "the basic outlook for our Petroleum Service Product Lines remains strong throughout 1982 and the decade of the 1980's."

3. As reported by DJ on April 26, 1982, NL said it expects earnings for the remainder of 1982 to show improvement over 1981's results, but at a smaller rate of increase.

4. As reported by DJ on April 30, 1982, Theodore C. Rogers, NL's newly elected

Chief Executive Officer, said that NL's revenues came from services and equipment for deep wells where activity has not been slowed as much as shallower wells. He said that "NL's future isn't tied to the rig count. It's tied to the type of wells drilled." Rogers recklessly predicted that NL would have record earnings for 1982.

5. On July 28, 1982, NL said it expected its income in the second half of 1982 to be below its 1981 levels and 1982 results most likely will be below those of the previous record year.

6. As reported by DJ on October 27, 1982, NL reported reduced U.S. drilling activity. The company said that similar conditions were expected to prevail during early 1983, but that drilling activity should increase gradually during the balance of 1983.

7. As reported in the Wall Street Journal on November 29, 1982, an Executive Vice-President of NL said "we've probably seen the bottom" of the decline in U.S. drilling activity.

8. In a letter to the shareholders dated March 1, 1983 and published in NL's 1982 Annual Report, Adam and Rogers stated that they "continue to believe that the fundamental, long range opportunity for our petroleum service business remains substantially unchanged."

9. As reported by DJ on January 25, 1984, NL said that it expects drilling activity to increase during the second half of 1984 and that 1984 should be a profitable year.

■ The last five of these representations were made after Levine had purchased his stock. Thus, these representations are not actionable under section 10(b) and Rule 10b–5 by a class represented by Levine. *See Denny v. Barber*, 576 F.2d 465, 468–69 (2d Cir.1978); *Schwartz v. Novo Industri A/S*, 658 F.Supp. 795, 799–800 (S.D.N.Y.1987).

■ The remaining four representations are in the nature of predictions concerning NL's financial condition. To recover on the ground that these predictions were false, plaintiff must establish that NL knew or

was reckless in failing to know that NL's financial future would not eventuate as forecast. *See Denny*, 576 F.2d at 470; *see also Goldman v. Belden*, 754 F.2d 1059, 1068–69 (2d Cir.1985); *Lazzaro v. Manber*, 701 F.Supp. 353, 363–64 (E.D.N.Y.1988). To withstand a motion for summary judgment, plaintiff must proffer evidence which creates a genuine dispute as to whether the predictions were "honestly held view[s] based on [NL's] considered judgment given the information before it." *Schwartz*, 658 F.Supp. at 799. Plaintiff cannot simply allege "fraud by hindsight." *Denny*, 576 F.2d at 470.

Plaintiff argues that he has created a genuine issue of fact as to whether NL knew or was reckless in failing to know that the representations painted a rosier picture of the petroleum services business' financial picture than was in fact the case. His argument is based on internal documents that were in existence at the time the statements were made. Plaintiff alleges that those documents reveal that NL was uncertain about the future performance of its petroleum services business. However, an examination of those internal documents as well as the context in which the representations appear reveals that the public statements accurately reflected NL's internal forecasts at the time.

First, plaintiff challenges statements made by Ray C. Adam, Chairman of NL, as contained in a NL news release of January 27, 1982. Defendant's Exhibit 6. In particular, plaintiff argues that Adam's statements that "[t]he company expects each quarter in 1982 will show improvement over 1981" and that "NL expects further improvement in its financial position in 1982" were not supported by NL's internal documents. However, the only internal document that plaintiff has offered that was in existence at the time is NL's 1982 Annual Operating Plan dated January 27, 1982. Defendant's Exhibit 143. The projections in the Plan, which was prepared by the Department, were entirely consistent with Adam's statements. In the Plan, the Department took an optimistic view of NL's 1982 business prospects. The Depart-

ment indicated that it was "convinced that substantial growth remains for the industry," and that "for 1982, business has [a] solid market foundation." The Department assumed a 16% increase in the market for petroleum services, an 18% growth rate in its petroleum services operation and a 4% growth in its chemical operations. Finally, the Department concluded that "in 1982, growth to be broadly based. All major units planning substantial sales and income growth."

Despite ample support for his prediction that NL's financial position in 1982 would improve, Adam tempered his optimism. The same news release also reported that "[t]he NL chairman noted recent unfavorable investor reaction from the current oil oversupply and a corresponding drop in the wholesale prices of oil." Defendant's Exhibit 6. Thus, there is no evidence to support plaintiff's claim that this public announcement painted a rosier picture of NL's financial condition in 1982 than was projected in NL's internal documents.

The second series of statements made by Adam that plaintiff challenges are contained in a NL news release of March 24, 1982. Plaintiff's Exhibit I. In particular, plaintiff argues that the following five statements were not supported by NL's internal documents: 1) NL "expects to report record income in the first quarter of 1982"; 2) NL "expects the second quarter [of 1982 will] show a significant improvement over 1981's results"; 3) NL's petroleum services business "is not heavily involved in the more oversupplied categories such as drill rigs or standard tubular goods"; 4) NL's petroleum services business' "products and services were used primarily in deeper, more complex wells where demand continues to be relatively strong"; and 5) "The basic outlook for our petroleum services product lines remains strong throughout 1982 and the decade of the 1980's."

Plaintiff argues that these statements are inconsistent with several of NL's internal documents. First, plaintiff points to a summary of NL's operations that was presented to the Board of Directors on February 24, 1982. Plaintiff's Exhibit X. Plaintiff notes that the summary indicated that "[c]hemical results were well below plan at U.S. operations," and that the petroleum services business reported an overall shortfall. Second, plaintiff points to a Discussion Draft of NL's Strategic Planning Guide: Five Years 1982–1987. Plaintiff's Exhibit Z. The guide is dated March 3, 1982, and was prepared by the Department. The Department wrote that "the rate of increase [in drilling activity in the U.S.] is expected to slow in 1982 and further through 1987," and that "the outlook for Petroleum Services has a considerable degree of uncertainty." Third, plaintiff points to an Exploration and Production ("E & P") Survey dated March 15, 1982. The Survey was prepared by J.E. Hannsz, Director of Strategic Planning in the Department, for Theodore C. Rogers, NL's president. Plaintiff's Exhibit AA. Hannsz stated that "[c]ontingency plans are currently being developed among most of the major producers." He noted further that if OPEC did not defend the current price of crude oil, the most likely downside scenario is that "drilling programs might be delayed and that 1982–83 drilling activity *could be flat or down slightly.*" (emphasis in original). Fourth, plaintiff points to the World Drilling and Rig Construction Forecast: 1982–1987. Plaintiff's Exhibit BB. The Forecast is dated March 23, 1982, and was prepared by the Department. In particular, plaintiff draws attention to the statement that "[t]here is much uncertainty about 1982," and the Department's request that units of NL prepare a contingency plan for 1982. Finally, plaintiff points to Rogers' report to the Board of Directors on March 24, 1982. Plaintiff's Exhibit 19. Rogers reported that "February results show a weakness in some areas," and that contingency plans had been prepared for each unit "in the event of a petroleum over-supply situation."

By quoting selectively from these documents, plaintiff has created a misleading impression. When viewed in their entirety, the documents are not inconsistent with the optimistic representations made by Adam.

Adam's first two statements, in which he predicted record earnings for the first two quarters of 1982, are amply supported by the same documents on which plaintiff relies. While the summary of NL's operations that was presented to the Board on February 24 did mention unfavorable results in certain operations, the bottom line was that "January income from continuing operations totalled $.39 per common share and was $.03 per common share better than plan ..." Plaintiff's Exhibit X. In addition, Rogers reported to the Board that while there were some problems in certain divisions of the petroleum services group, "all are expected to be on plan as the year progresses." Plaintiff's Exhibit 7. Similarly, despite the fact that the Department in its Draft Strategic Planning Guide believed that growth in drilling activity in the U.S. would slow in 1982, it still predicted a 16% increase in drilling activity over 1981. Plaintiff's Exhibit Z. Since NL experienced a record amount of drilling activity in 1981, the increase in 1982 would produce another record year.

In addition, in citing Hannsz's E & P Survey, plaintiff focuses on Hannsz's downside scenario even though Hannsz considered it unlikely that this scenario would materialize. Plaintiff's Exhibit AA. Hannsz noted that "most major producers believe that OPEC will defend the current price of crude, and that any temporary weakness in the spot market is not significant to E & P expenditures as the government windfall profits tax is as much as 70 percent of the marginal dollar." He stated further that "[t]here is a general belief among the producers that OPEC's problem may be relatively short term, as demand is expected to increase with economic recovery in the second half of 1982." Furthermore, while the Department's World Drilling and Rig Construction Forecast said that there is much uncertainty about 1982, it still predicted an 11% increase in rig activity in the United States over 1981. Plaintiff's Exhibit BB. Finally, while Rogers reported to the Board on March 24 that February results showed a weakness in some areas, he also indicated that "management continues to believe that

drilling will continue at levels sufficient to justify continued reliance on original forecasts." Plaintiff's Exhibit 19. The original forecasts, as set out in NL's 1982 Annual Operating Plan, predicted record earnings in 1982. *See* Defendant's Exhibit 143. Thus, Adam's predictions regarding NL's performance in 1982 were consistent with NL's internal documents.

Plaintiff has not pointed to anything in NL's internal documents that casts doubt on Adam's three statements concerning NL's petroleum services business. Plaintiff does not dispute that the petroleum services business focused on the deeper drilling segment of the market. In the World Drilling and Rig Construction Forecast, the Department indicated that "deeper drilling ...is expected to grow more rapidly than shallow drilling." Plaintiff's Exhibit BB. As for the long term prospects of this business, the forecast said that "long term growth in drilling activity seems assured." Similarly, the Department's Draft Strategic Planning Guide predicted that while the tremendous growth in drilling activity in the U.S. in 1981–82 would slow in 1982–87, it would still increase at a rate of 7% per year. Plaintiff's Exhibit Z. Plaintiff has not pointed to anything that contradicts this evidence. Thus, he has failed to create a genuine dispute as to whether Adam's predictions on March 24 were anything but "honestly held view[s] based on [his] considered judgment given the information before [him]." *Schwartz,* 658 F.Supp. at 799.

The third public announcement that plaintiff claims contained a material misrepresentation occurred on April 26, 1982. In a News Release, NL said that "it expects earnings for the remainder of 1982 to show improvement over 1981's results, but at a smaller rate of increase." Plaintiff's Exhibit 27. Plaintiff relies on the same documents noted above in arguing that this statement was overly optimistic in light of information available to NL at the time. In fact, based on the previous examination of NL's internal documents, it is clear that this statement closely tracks the Department's projections. Moreover, in the same

news release NL acknowledged the "weakening world oil prices"; that "[a]ll operations, particularly the U.S., were affected by depressed economic conditions"; that "[e]arnings for the company's 50 percent owned subsidiary ... were slightly below the comparable 1981 quarter"; and that "NL Baroid's line of drilling fluids ... experienced some softness in certain areas." In short, NL did not present a completely rosy picture of the company's financial condition, and there is no evidence to suggest that its prediction of the company's earnings for the remainder of 1982 was not well-grounded.

The final series of statements that plaintiff challenges were made by Theodore C. Rogers, President of NL, at the company's annual meeting on April 30, 1982. Defendant's Exhibit 5. Plaintiff argues that the following statements are insupportable: (1) "Finally, NL serves the deeper drilling segment of the market. By this, we mean wells 10,000 feet and deeper—which have been and will continue to grow at a more rapid pace than drilling in general. In fact, 60% of NL's petroleum service revenues are derived from such wells." (2) "NL's future is not tied to rig count, but to the type of wells being drilled." (3) "We, therefore, expect to achieve another record year in 1982."

Plaintiff points to the above-mentioned documents as well as to the minutes of the Board of Directors' meeting of April 30, 1982, to support his claim. Plaintiff's Exhibit W. Plaintiff notes that Rogers reported to the Board that there was a "reduction in the receipt of orders at some units," and that the company was making "changes in capital spending plans which would be employed to offset any market softness."

Neither this document nor any other document that plaintiff has proffered suffices to raise an issue of fact as to whether Rogers knew or was reckless in failing to know that NL's true financial picture was not so bright in some respects as he had painted it to be in his representations. NL's documents reflect Roger's statement that NL's future is tied most closely to the number of deep wells drilled, and that the deep drilling segment of the market was predicted to grow at a faster rate than the drilling market in general. *See* Plaintiff's Exhibit BB. As to Roger's prediction of a record year in 1982, he clearly had support. The prior year was a record year for NL, and all internal documents predicted an increase in growth for NL in 1982. Finally, Rogers tempered his optimism with several caveats. He stated: "Yes, there is a great deal of concern today about the future of the oil service industry. This concern centers on the fact that spot oil prices have been dropping. Due to the worldwide recession and the results of concerted conservation efforts on the part of consumers, the demand for oil has declined." Defendant's Exhibit 5. He also noted that it "would be unrealistic to assume [30%] growth rates [in U.S. drilling activity] would continue." *Id.* Once again, Roger's statements followed those of the Department in its internal documents.

In summary, the four sets of representations that plaintiff has challenged reflected the internal information that was available to NL at the time. Thus, plaintiff's argument that based on internal documents he has created a genuine issue of fact as to whether NL knew or was reckless in failing to know that the representations painted a rosier picture of the petroleum services business' financial picture than was in fact the case has to fail. Accordingly, summary judgment in favor of NL is appropriate.

## CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment on plaintiff's claim that it issued nine material misrepresentations with respect to its petroleum services business is granted, and that claim is dismissed. Since I have previously granted defendant's motion for summary judgment on plaintiff's only other claim, the complaint is dismissed in its en-

tirety.[1]

SO ORDERED.

---

1. There is no need for me to reach defendant's motion to amend its answer to assert a statute of limitations defense, or defendant's argument that plaintiff has failed to present any evidence that he has been injured, and therefore I do not do so.