**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**WELLSHIRE SECURITIES, INC., Ventura Inc., Environmental Landfills, Inc., Robert Edwin Cohen, Carol Catherine Martino, Joseph Jenkins, Jr., Edward David Braverman, Alan Diamond, Paul V. Winters, Jr., Robert Beck and Richard Sands, Defendants.**

**No. 90 Civ. 1707(KTD).**

United States District Court,
S.D. New York.

June 26, 1991.

Edwin H. Nordlinger, Deputy Regional Administrator, S.E.C., New York City (Jef- frey Plotkin, Allen Meyer, of counsel), for S.E.C.

Ross & Hardies, New York City (William Pinzler, of counsel), for defendants Ventura, Inc., Robert Beck and Richard Sands.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiff the Securities and Exchange Commission ("SEC") commenced this action on March 14, 1990 seeking to enjoin violations of federal securities laws as against the captioned defendants. On March 23–26 and 29, 1990, I conducted a preliminary injunction hearing. Among the defendants named were Richard Sands, Robert Beck, and Ventura ("the Ventura defendants"). Injunctive relief was denied as against Sands and Beck, but Ventura, the corporation under their control, was enjoined. Ventura later requested that I reconsider the preliminary injunction as against it. Such reconsideration was denied on September 12, 1990. Some familiarity with my prior decisions is presumed. On February 14, 1991, the SEC moved for a permanent injunction against Ventura, Beck, and Sands under §§ 17(a)(1) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77q(a), 10(b) of the Securities Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. A hearing regarding permanent injunctions was held on April 10, 1991. The following constitutes my findings of fact and conclusions of law.

## STATEMENT OF FACTS

Ventura is a Delaware corporation, organized on December 28, 1987, with a principal place of business in Massachusetts. Formed as a blind pool,[1] Ventura was to seek potential business ventures. Consent Pretrial Order ("PTO") ¶ 55.

FELCO was a Massachusetts based, privately held company that primarily en-

---

**1.** A blind pool is formed when stocks are offered in a hollow company which company's principals have yet to determine where and in what business or businesses they will either invest or acquire. Investors are induced into buying into a blind pool solely on the strength of the principal's knowledge, investing expertise, and assurances of financial success.

gaged in the business of equipment leasing of physical fitness, recreational, office, physical rehabilitation, medical, dental, and security equipment. PTO ¶ 4. FELCO bought the equipment, received financing through banks, and leased it out to users. Eventually, FELCO became unable to obtain asset-based financing. When that occurred, FELCO altered its primary business from leasing equipment for its own portfolio, to lease origination and brokerage of leases which did not require bank financing.

In 1988, FELCO shareholders were approached with the suggestion that FELCO acquire International Bancorporation, Inc. ("IB"). IB was an insurance company that insured other carriers for casualties resulting from maritime losses. It was to have had the ability to insure FELCO's leases.

While FELCO was still a privately held concern, it issued 40 shares of common stock, out of a total pool of 120 shares, for the acquisition of all capital stock of IB. At the time Ventura was seeking to acquire IB, Howard Chiten, a purportedly experienced businessman in the insurance industry, appraised IB favorably to the Ventura defendants. Chiten's valuation of IB was accepted by FELCO's then outside accountants, Schwartz and Katz, in preparing the audited financial statements for the fiscal year ending August 1988. As a result of the acquisition, Chiten became a Ventura shareholder and a member of its Board.

In 1988, Michael Strauss and Edward DiResta approached FELCO shareholders and suggested that FELCO acquire General Consulting Services, Inc. ("GCS"), a development stage entertainment company. PTO ¶ 19. GCS was a corporation controlled by DiResta, who represented that GCS owned certain rights to television series and animated specials featuring Bing Crosby. As reported in an audited financial statement prepared by Schwartz and Katz, GCS's film inventory was valued at $1,150,000.

In late March 1989, Ventura acquired all of the issued and outstanding capital stock of FELCO and FELCO became a wholly owned subsidiary of Ventura. A voting trust comprised of the former FELCO shareholders (including the former owners of GCS and IB) received 1.8 million Ventura shares, which constituted a controlling interest in Ventura. On May 22, 1989, soon after IB became a subsidiary of Ventura, FELCO rescinded the IB transaction. The recision of IB was ratified by Ventura's Board of Directors on July 12, 1989. PTO ¶¶ 66–67.

Shortly after the acquisition of IB and GCS, Sands, FELCO's then Secretary and Director, received a telephone call from a Wellshire [2] broker asking for confirmation of certain information that Wellshire had apparently published in one of its market letters concerning Ventura and FELCO. Specifically, Theodore Feit, an individual who drafted Market Letters for Wellshire, drafted a Market Letter about Ventura ("Feit Draft"). PTO ¶ 74. Sands told the broker that the information was inaccurate and, at his request, a document dated March 10, 1989 and containing the Wellshire Securities masthead was telecopied to him. Sands and Beck, FELCO's then outside director, reviewed the document and Sands ultimately corrected the draft ("FELCO draft"). Sands then circulated the draft to at least Chiten, Beck and Cecil Mathis, Ventura's attorney at the time. The FELCO draft was sent back to Wellshire and incorporated into Wellshire's market letters. Any reference to IB was edited from the market letters before they were disseminated.

Beck served as FELCO's outside director from 1984 through 1989. As of January 1990, Beck was Chairman of the Board of Ventura as well as trustee and beneficiary of the voting trust, which represents a majority of the shares in Ventura. He has since resigned his Board post. In 1984, Sands was FELCO's Vice President, he became FELCO's Secretary and Director in

---

**2.** A registered stock broker-dealer and a member of the National Association of Securities Dealers. Wellshire in this action already has been enjoined from violating federal securities laws.

1986, and by 1989 was elevated to the position of President of FELCO. Sands resigned his positions at Ventura in the summer of 1990. Currently, Sands is unemployed.

## DISCUSSION

■ Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), section 10(b) of the 1934 Act, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, prohibit fraud in the offer or sale, or in connection with the purchase or sale, of securities. To establish liability under the above provisions, the SEC must show by a preponderance of the evidence that in the offer or sale, or in connection with the purchase or sale, of a security, an affirmative misrepresentation was made or there was a failure to disclose material non-public information when there was a duty to do so. Additionally, plaintiff must show scienter on the part of the defendants.

■ A corporation and its officials have no duty to correct misstatements in the press that are not attributable to them. However, a duty may arise where a defendant corporation "sufficiently entangled itself with the analysts' forecasts to render those predictions attributable to it." *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir.1980). The SEC asserts that the Ventura defendants' activity and involvement with the preparation of the FELCO draft satisfied the level of entanglement necessary to attribute to them the statements made by Wellshire in its Market Letters. I disagree.

The Ventura defendants were contacted in order to review the Feit Draft, Wellshire's first draft of its market letter which contained reference to FELCO. Upon making certain corrections, the draft was recirculated to Beck and Sands for further revisions after which Wellshire produced the FELCO draft. The level of involvement of the Ventura defendants did not approach the cooperation necessary to indicate "entanglement." *See Elkind v. Liggett & Myers, Inc.*, 635 F.2d at 163 (despite extensive involvement by the company—meetings with analysts and company management at which company officials discussed operations, and reviewed and commented on reports which analysts used in order to prepare and correct errors and misunderstandings—statements made by the public relations firm not held attributable to the company.)

The facts of the case at bar indicate less entanglement than in *Elkind,* where the court was not inclined to find entanglement because the company's general policy was not to involve itself with forecasting. No evidence has been presented as to any meetings between the Ventura defendants and Wellshire in preparing the drafts at bar or Wellshire's Market Letters.

Several weeks after the Feit Draft was returned to Wellshire by Sands, suspicions arose that the subsidiaries were not what their principals purported them to be. As a consequence, certain actions were taken by Beck, Sands and FELCO/Ventura which are not consistent with the SEC's allegations of violations of the securities laws. Suspicions regarding IB were precipitated by the Ventura defendants' doubts that Strauss, who had promoted the acquisition of IB, was not the person he purported to be. FELCO was further concerned about the lack of progress by IB's management in obtaining. necessary reinsurance.[3]

---

**3.** The SEC declined to take Strauss's deposition as the person who introduced FELCO to Ventura, Wellshire, Chiten, and DiResta. At the hearing, the SEC claimed that Strauss's testimony was not credit-worthy because he had been convicted of, and enjoined from repeating, certain securities law violations. As I pointed out at the hearing, it is ridiculous for the SEC to discredit the testimony of one convicted of securities law violations in light of the fact that often cases are built by the SEC on the same type of testimony. Although the SEC was likely not acting with indifference when it failed to take Strauss's dep-

osition, I cannot in good conscience enjoin the Ventura defendants from earning their livelihood on the submissions and record before me. Additionally, the SEC declined to take the deposition of the accountants at Sullivan and Bille, retained by Ventura after it merged with FELCO and became a public company. It was Sullivan and Bille that advised FELCO's accountants, Schwartz and Katz, with regard to the IB recision and GCS's severe asset difficulties. It is important for the Commission to recognize that *allegations* of grievous wrongdoing, no matter

Based upon these factors, Beck and Sands were appointed to a committee to review IB and value its assets. This committee was directed to provide the Board of Directors of Ventura with a status report as to IB.

Robert Cohen, Wellshire's principal, was kept fully informed by Beck of the Board's suspicions and of the committee's investigation. After the committee was unable to confirm that IB would obtain the necessary reinsurance and that as a consequence the company might not produce sufficient revenue for Ventura, the committee recommended that the IB transaction be rescinded. This information was forwarded to Cohen, who testified at the preliminary injunction hearing that he removed the references to IB based on information he received from Beck.

On May 22, 1989 when the committee recommended the recision of FELCO's acquisition of IB, it based its conclusion on the fact IB could not conduct the business as Chiten and Strauss had represented. It was not until July 1990, however, that the recision was completed and Chiten had resigned from the Board of Directors. Beck immediately informed Cohen of the recision and the resignation. Notably, the SEC has not produced any evidence to refute the prudent actions of the Board which advised Cohen of events at FELCO/Ventura. As a consequence of the recision of the IB transaction, Ventura was required, according to generally accepted accounting principals, to restate its financials as if the acquisition had never occurred. Accordingly, the revised financials eliminated any reference to IB or its assets as appraised. In essence, the SEC seeks to punish the Ventura defendants for actually taking concrete steps to verify the information in the draft.

Indeed, it was Feit, a third-party affiliated only with Wellshire, who was made responsible for drafting the document. That the Ventura defendants actively sought to confirm the information by consulting with knowledgeable individuals, passing along corrections to Wellshire, indicates no more than a willingness to be cooperative. If I were to find that to con-

how often repeated, are not a substitute for

stitute "entanglement" in furtherance of a fraud, I fear as a consequence a pervasive chilling effect on cooperation and honesty, especially in light of the fact that personal reputations and livelihoods are often that which are at stake. Certainly the personal and professional reputations of both Beck and Sands, which have never before been in question, are at risk here.

■ As I stated during the hearing, the SEC has much less to lose by a denial of an injunction here than do either Beck or Sands, neither of whom financially benefited from the Wellshire scam. Inasmuch as the SEC has standing to request the relief, notwithstanding that a defendant reaps no actual benefit, that does not mean that an injunction is always warranted. Sands is currently unemployed, but the imposition of being enjoined would mar an otherwise clean work history. In addition, the encumbrance of a permanent injunction against Beck would most seriously affect his ability to earn a livelihood as he has been employed in similar positions with similar entities for his entire professional career. I would have no qualms about removing Beck's privileges in the securities area if his acts were so egregious as to amount to securities law violations. However, after evaluating Beck's testimony from the preliminary injunction hearing, and then later listening to the SEC plead its case before me in the permanent injunction hearing, there seems to be no compelling need to enjoin Beck. His actions, although perhaps careless, are not the kind of acts which threaten his present or future clients. The SEC has failed to convince me that either Beck or Sands are likely to repeat any of the acts alleged here.

■ Similarly, scienter must be shown on the part of the Ventura defendants. Scienter refers to a mental state embracing intent to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976); *see Aaron v. SEC*, 446

proof.

U.S. 680, 691, 100 S.Ct. 1945, 1952, 64 L.Ed.2d 611 (1980) (SEC required to establish scienter in civil enforcement actions arising under § 10(b) of the 1934 Act, and Rule 10b–5 promulgated thereunder). In order to show scienter, the SEC must demonstrate either that the defendant had actual knowledge of material facts that were omitted or distorted or failed or refused to ascertain and thereafter accurately disclose such facts after having been put on notice as to their possible existence.

The SEC claims that Beck and Sands acted with knowledge of the falsity of statements in the FELCO draft concerning leasing obligations, and failed to act with adequate due diligence to elicit the true facts. While it is true that corporate insiders "have a special responsibility to be meticulous and precise in their representations to shareholders," the amount of diligence due is to ascertain that the information published was truthful and that such diligently obtained information was published in good faith. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 861–62 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). I believe that Beck and Sands in good faith endorsed the publishing of the information contained in the FELCO draft and were diligent in overseeing the removal of potentially misleading information with regard to the IB recision. Moreover, neither Beck nor Sands knew information at any time relevant to the disclosure, and the SEC has not persuasively refuted the fact that there was no more readily obtainable or meaningful information available to them at the relevant times.

The SEC builds its fraud theory as against Beck and Sands with the benefit of hindsight. Specifically, the SEC criticized the review of the FELCO draft because reliance was placed on Chiten and DiResta, the IB and GCS principals, as to the truth of statements contained within the draft regarding those two subsidiaries. The SEC claims that reliance was misplaced because these individuals were the same individuals who had recently sold IB and GCS to FELCO. Averring this to be a highly irregular business practice, the SEC faults Beck and Sands for blindly trusting and not further questioning the IB and GCS principals regarding the financial worth and forecasts of these companies. The SEC asserts that such practice amounts to a fraud because other more objective sources would have obtained more truthful information, and failure to either report or obtain that information was so reckless as to constitute deceit. *See Lanza v. Drexel & Co.*, 479 F.2d 1277 (2d Cir.1973) (reckless disregard of the truth determined by whether defendants failed or refused to disclose facts after being put on notice of a possible failure to disclose, where facts could have been obtained and revealed without extraordinary effort.) In my estimation, although the actions by Beck and Sands, with the benefit of hindsight, appear ill-advised, they cannot be construed to have been taken with reckless abandon as the SEC argues nor can such actions be construed as showing scienter.

At the time that the FELCO draft was being produced, the only people with accurate information about IB and GCS were the very principals of those companies. The Ventura defendants had no other resource with which to obtain the information that the principals at IB and GCS (who were also the chief operating officers of these entities) were able to produce. Moreover, the principals involved with these subsidiaries supported their claims about the value of their companies by providing evidence of insurance treaties in which IB claimed to have an interest, business plans for future operations (which supported the synergistic nature of the anticipated operations between the subsidiaries and FELCO's leasing business), documentation, copyrights, contracts and agreements showing ownership of properties by GCS, and a published listing of stations that aired certain of the programs owned by GCS. Thus, the reliance by Beck and Sands on Chiten and DiResta was not imprudent, let alone so egregious as to amount to recklessness. *See Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 137 (S.D.N.Y.1989) (in order to prove scien-

ter, the SEC must instead prove that forecasts were disseminated with knowledge of their falsity or that the "method of preparation was so egregious so as to render their dissemination reckless.")

■ To suggest that the information was readily available elsewhere amounts to no more than Monday morning quarterbacking. Indeed, "fraud by hindsight" does not constitute a violation of the federal securities laws. *Levine v. NL Industries, Inc.,* 720 F.Supp. 305, 308 (S.D.N.Y.1989). Furthermore, finding that greater clairvoyance might have helped the defendants to perceive the future more accurately does not elevate that failure to a fraud. *Denny v. Barber,* 576 F.2d 465 (2d Cir.1978).

■ Finally, "[t]he critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir.1972). The burden rests with the SEC to establish the likelihood of future violations. *SEC v. Electronics Warehouse, Inc.,* 689 F.Supp. 53, 68 (D.Conn.1988), *aff'd,* 891 F.2d 457 (2d Cir.1989). The SEC claims that the existence of past violations provides an inference that there will be future violations. In this instance and under the facts proven, I must disagree. Even if I had found Beck's and Sands' activities to be violative of the securities laws, that does not assure injunctive relief shall be granted. *See SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir.1977) ("[a]lthough a single act in certain circumstances may warrant equitable relief, there is no per se rule requiring the issuance of an injunction upon the showing of a past violation.")

An inference may be drawn as to the likelihood of repeating the wrong in the totality of the circumstances. *Id.* Because the SEC's sole theory of liability rests with

and is predicated on the FELCO draft, I find it difficult to determine that this isolated occurrence is likely to recur. The record before me is devoid of any evidence tending to show that the Ventura defendants asked Wellshire to draft or distribute a summary of FELCO's business. The drafting of the Wellshire Market Letter, containing the FELCO draft was executed by and the brain child of Wellshire. Indeed, it was the Ventura defendants who hastened to communicate to Wellshire the adverse facts regarding the FELCO insurance and entertainment subsidiaries when those facts came to be known to them. This avoided any issuing of financial statements that could have perpetuated mistaken information. Far from demonstrating a propensity towards reckless disregard of the truth, the Ventura defendants took prudent, prompt, and business-like steps to avoid disclosure of misleading information. This conduct is not consistent with a propensity for reckless disregard of the truth and does not constitute acts tending to show a likelihood toward violating securities laws in the future. Neither are Beck and Sands affiliated with Ventura any longer. I am also swayed by the fact that both Beck and Sands have never before been targeted for or embroiled in litigation such as this and their past records are beyond reproach. That they would suffer undue stigma as a result of being enjoined for securities law violations is a hardship too onerous for them to have to bear under the circumstances presented by the SEC at bar.[4]

After careful consideration of the submissions and proceeding minutes, I find that there is no evidence compelling a finding of bad faith on the part of the Ventura defendants. Beck and Sands seemingly acted in good faith on advice of the principals of FELCO's subsidiaries, in consultation with Ventura's auditors and attorney. They are no longer officers or directors of Ventura. The conduct by the Ventura de-

---

**4.** [I]n deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts.... Accordingly, the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1102 (2d Cir.1972).

fendants constituted no more than a single, isolated occurrence involving no intentional violation. Thus, there is little likelihood of recurrence at some future time.

For the foregoing reasons, the SEC's application for a permanent injunction as against Beck and Sands is denied and the injunction in place against Ventura is dissolved. This matter would be closed out except for the failure of the SEC to seek permanent injunctions against the other defendants.

SO ORDERED.